Good morning. I am Chad Biggins, and if it pleases the Court, I'm here for the appellant, Townsend Industrial Sales. I'd like to reserve two minutes, if I could, for rebuttal as well. We're here today to pray that the Court reverses the lower court's decision when it took away the jury verdict from my client. After a long battle and fight, we won a jury verdict of $1.28 million, and we proved every element of our case. That case was subsequently taken away by the judge changing his mind on the issue of lost profits. Before the verdict was heard, the judge listened to opposing counsel in TRW's arguments about whether or not we had substantially stated what the lost profits were by our expert testimony and by the lay witness testimony of Paul Johnson, Doug Johnson, and many other The judge actually argued for us prior to hearing the verdict and argued against Mr. Williams, saying, no, no, no, Mr. Ingle did testify that lost commissions equals lost profits. When I tried to make statements in this regard to the judge, the district court said, no, don't worry move on, counsel. Talk about something more interesting to me, because this is a moot point. So then for him later to come back after hearing the verdict and the jury unanimously finding for every element of the case, and in fact, we asked for $1.8 million, awarding $1.2, and saying, no, there was insufficient evidence of damages. And the reason he did that is he had to take away the expert witness's testimony, Jason Ingle, by saying that he didn't have enough information. He didn't know enough about sales reps in the specific business relating to airbags. Just because he knew about how sales reps run their business in general doesn't mean that he knows about sales reps in the airbag industry. Well, you know, there was no evidence whatsoever. The defense did not put on any experts, nobody to say, there was no evidence whatsoever to say that a sales representative who deals in airbags has any different costs from a normal sales representative that sells any other kind of part, like this pen. Could I just clarify something about the lost profits? Is it correct that the damages or the lost profits were limited to commissions on sales that had already occurred? Yes. Is that correct? And under the contract, did Johnson Industrial Sales have any obligation to perform any further steps? No, none at all. Once the sale was made, he was entitled to his commission. The contract provided that the sales commission would be paid as the invoices were paid from the buyer to the seller. But he had no further obligations. He sold a program in August of 2001. That program was worth $40 million, but it was little parts that were like 50 cents each or a dollar a piece. But he wasn't selling one part at a time. He sold the entire program. And that was the moment of the sale. That was the moment that he was the procuring cause of that sale, which cemented my client's right to the commission. It was taken away by the bad acts of the defendant, who we proved in trial, did maliciously stole his commissions from him. So that's what happened. And that's why he's entitled to the commission. And that's exactly why Jason Engel testified that there are no costs to offset any lost commissions, because there's nothing further to do. The work was already done. He had already procured the sale. Who went out to patch up the sale when there were problems encountered? Salesmen make a lot of sales, and they have problems. Later on, they go and see the person to whom they made the sale, and they try to work out whatever the problems are. That never happened in this situation? Well, that's what was... Or were they, those costs were assigned, I gather, to future sales rather than to past sales. Is that right? Well, you're right about one thing. Say, for example, this didn't happen because of the interference, which was proven at trial. But if, and this is common in business, if you have a problem, say a shipment is late or a part doesn't match specs, who are they going to call? They're going to call the sales rep, and the sales rep's going to run down to the TRW factory, maybe with a box of donuts, drive, you know, the gas mileage, whatever. Those are the expenses that we're dealing with. We're dealing with his driving to TRW, which is just a few miles from his home, which is where his office is and all that. Now, so what are those costs? Mr. Engel said, if that would have happened, which we can't predict what would have happened or not, but if that would have happened and if Mr. Johnson would have driven to TRW to help them solve their problem with one of the parts manufactured by Wing Wire, then those costs would have been too de minimis, too insignificant, to alter the damages calculations that he had made based on the net present value of the sales. But whether or not he went down with the box of donuts, he had no obligation to do that. He was still entitled to the commissions from any sales. Is that correct? That's correct. But his obligation would be in realizing two things. One, going as a salesman, going to TRW is an opportunity to sell, to make a future sale. So he wants to go there for his own reason, because as it was testimony in the trial, he doesn't just represent Wing Wire. He represents numerous principles with different products. And that's why he has synergies. That's why sales reps are important to the to the marketplace. And it's actually codified in California Civil Code Section 1738.10 that we are that sales reps are an integral part of the economy. And they're very necessary. And that's the commission protection. Statute is they're useful for a while, but then they're useful as declines. And you get into lawsuits like this. The problem with sales reps is that when they're too successful, they get cheated out of their commissions. When they make the big sale, when they finally catch the big fish. See, Mr. Johnson had been working for years with Wayne Wire, the principal. But their sales were like forty thousand dollars a year. When they finally reeled in the big fish, got the forty million dollar sale. They eliminated him. But they did it because TRW told him to, because TRW wanted and actually received and is still receiving his commissions. And that that goes to why. Why did they interfere? Why was it malicious? But the bottom line is still that the commissions were earned at the time of the sale. We calculated those commissions with an expert witness who also said that any any future costs, which might have been incurred by some problem that arose a year, whatever, down the road with the production, would have been too insignificant to alter the damages. And and as the story parchment paper Supreme Court case says, when the wrongdoer is the one that's made the calculation of the damages or at least a part of the damages difficult or impossible to do, then it's the wrongdoer, not the victim, who must suffer that that lack of being able to prove with certainty. We did the best we could. There's no way to prove to establish how much he would have had to go out to TRW or not. The bottom line is what he had done before making the sale. We proved he bought lunch one time for the buyer. He bought her a pair of tickets to a football game, which were fifty dollars each testified to. He traveled to Michigan one time. The judge and even opposing counsel didn't have any expert, didn't have any one thing to say. What are the actual costs that's in their imagination that a sales rep would have had? A sales rep doesn't. Paul Johnson testified to in trial. A sales representative doesn't manufacture anything. He doesn't buy materials. He doesn't sell materials. And if there's a problem, Your Honor, with with the part, the TRW doesn't expect Johnson to pay that cost. Look, if if they shipped the goods are defective and the sale is rescinded, of course, he doesn't get paid his commission. That's correct. And that's the other reason that Johnson has a vested interest in making sure that the that the program is successful even after the sale is made, because if that program stops, his commission stops. So he has two incentives to continue to service, even though service is incidental. Number one is because it gives them the opportunity to make future sales. And number two, if it's if the if the program fails, his commission stop. So those are his incentives. But what are the costs? Again, it's making a phone call that doesn't there's no cost in that email. That's free gasoline. OK. Gasoline is expensive these days. But the Jason Engel, the expert witness, testified about that. He said that was too insignificant to alter the damages. And according to this story, Parchment, the United States Supreme Court said we've proved enough. I think we understand your position. Why don't we hear from Mr. Williams? Oh, well, I have the other issue. Yes. Oh, did you want to raise your other issue? Do I have two minutes left or yes, you do. Just two minutes. OK, then I'll wait, I guess. Oh, no, you have four minutes. So the other issues were the main issue is punitive damages. We didn't get to try that to the jury because the judge knocked it out at summary judgment. But we had to still prove malice. And we did prove malice at trial. And what the judge said was, well, malice doesn't equal malice. But the case law does say that malice equals malice when you're talking about privilege and punitive damages. And considering whether the district court heard in the summary judgment decision, can we consider evidence that was raised at trial, not at the summary judgment stage? Yes, I believe you can. I believe that you can look at it from the perspective that since we did prove it and the evidence was exactly the same, Your Honor, that we presented on in opposition to summary judgment, it was exactly the same. It was the member of the D.J. issue letter that Lyndon Earbus wrote. That was part of the malice. It was the exact same information. We gave it to him in the summary judgment. He said that was insufficient. But the jury found it was so clearly the judge doesn't have the right to take away that issue from the jury. When he later made the jury find malice and the jury did find malice. So clearly what is malice? Your position seems to be that any any effort to make more money is malicious. Isn't it? Oh, no. If you're trying to eliminate the middleman, I mean, that's just a business decision that is not necessarily malicious. Well, the way she did it was just means in that context. Everybody. There's a commercial from Geico. Eliminate the middleman. There's a commercial about everybody tries to eliminate the middleman. But you can't eliminate them. It's illegal to eliminate the middleman in some instances when you don't deal with them in the beginning. But it's not legal to do it, to use the middleman and then squeeze them out afterwards. You can't use the buyer and seller can't use your position that every interference with contractual relations, every interference with contractual relations has to have some wrongful element to it or it's not actionable. But is it your position that any time you've proved that that you've also entitled yourself to punitive damages? No, your honor. We prove malice as a separate issue. And the reason we did it was with the testimony. What we had, the cancellation of the meeting. There was a meeting that was scheduled and Linda Nearbus freaked out and ran over to cancel it when she found out about it. And then she wrote the nasty D.J. issue letter saying, you know, basically the implication was even though we don't have the testimony, but we have the letter, she gets to notice for the meeting, runs over to the engineer to cancel it, and then calls up the buyer, I mean, the seller, Wayne Weyer, and says, how dare you have this guy? I thought I told you to get rid of him. That's my commission. Get him out of here. That's the natural inference that the jury drew. And that was what was malicious. In addition to a whole list of other things that are in the briefing that we had. But the bottom line is, it's not an issue because we proved it at the trial. And the judge even admitted at the end himself that we proved it. So I'll reserve my last two minutes. Thank you. Thank you. You have about a minute and a half for rebuttal. And Mr. Williams? Thank you. Good morning, Your Honors. Michael Williams on behalf of the respondent, TRW Vehicle Safety Systems, Inc. Your Honors, what happened here is TRW found itself in the middle of a commission dispute that started long before any alleged conduct on their behalf. And it was a commission dispute between Strema Sales and Johnson Industrial Sales. And what happened is after Johnson Industrial Sales succeeded in collecting half a million dollars from Strema in a settlement, they created this conspiracy theory and tried to paint TRW as a scapegoat. Counsel, you're starting down a path that's very similar to the path in your brief. And my concern about it is that we have a jury verdict against your client. And I think the rule is that notwithstanding the question about whether damages were proved, that with respect to the underlying conduct, don't we have to view the facts in the light most favorable to the jury's verdict? You do. However, it's a de novo review with regard to the judgment as a matter of law. And the question is whether there's substantial evidence to support the jury's finding. On the issue of profits? Well, on the issue of causation as well. Because as the district court properly held, there was no substantial evidence presented at trial that TRW's conduct either caused the split commission that Strema instituted or that it caused the termination of the agreement. But in looking at that question, don't we have to view the evidence in the light most favorable to the jury's verdict? That was taken away as a matter of law. But our general rule is that in terms of factual inferences to be drawn, we have to view them in favor of the verdict. But it still has to rise to the level of substantial evidence. And I'd like to explain why there is no substantial evidence supporting the fact that TRW's conduct caused any of the harm at issue here, which is what the district court actually found. Because I don't think you even get to the issue of lost profits or damages until you establish causation. And what the court properly held, and again, the law is very clear, to show substantial evidence of causation, it is not enough to show that causation may have been a possibility. It's not enough to show a temporal sequence of events. Especially in the light, you know, when you have contrary evidence, affirmative evidence proving otherwise. And here, there was affirmative evidence proving that TRW's conduct had nothing to do with the split in commissions or the termination of the agreement. They certainly had a motive to eliminate this middleman, didn't they? No, I disagree. If they got rid of him, they'd get a discount. Well, that's not exactly true. Because, as the evidence pointed out, this was a competitively bid project. It's not as if TRW had any commitment to work with Wayne Wire. These were projects that were competitively bid, as often happens in this industry. And it's a question, as Ms. Nurbis testified, it didn't make a difference to her one way or another because they're competing against other providers. I mean, they didn't need them anymore. That's the basic. But, Your Honor, no, that's not. That's not exactly correct. I mean, I don't know way back when somebody got TRW to start buying these things. Unfortunately, though, that was the theory that was presented, but there was no evidence to prove it. The theory was that this conduct by TRW, starting in November 2001, caused all of these bad things to happen. But the reality and the evidence was that back in January 2001, STREMA told Johnson Industrial Sales, we're cutting your commission to two and a half percent. They had an ongoing dispute, and that's supported by the testimony of Mike Brown, the principal and president of STREMA, who said, that's the reason I did it. I wanted to give the other two and a half percent to my son, Dave Brown, who was also running the business. There is absolutely not a shred of evidence that TRW got any financial benefit from this reduction. Can I just get back? I guess I'm confused about the 50B motion. As I read the 50B motion, the only portion of it that the district court granted was on the question of lost profits, not on, there was some ambiguous language about causation, but he didn't grant that portion of the motion, only the portion on the sufficiency of the damage evidence. Is it your interpretation of the 50B motion, maybe you could sort of walk us through, that the court based its determination on a causation, on the causation issue? Yes, it is. And let me explain why. Would you look at page 211, I believe that's. Yes, and I'm on that. If you look at the first full paragraph, the last sentence on that page, while the implementation of the cut was delayed, there is no substantial evidence to support a causal link between VSSI's conduct and the cut. There, if you go down to. Well, look at, why don't you look at the final paragraph. And I would like to explain that, Your Honor, because what's happening is it says there is, there is evidence from which the jury could have found a causal link between VSSI's communication and interference to the extent that claim was predicated on exclusion of Johnson from VSSI's facility beginning in 2002. Whether that interference for which there was substantial evidence supports the jury award is not before the court. What was going on there, and it's the only explanation for this, is that the only damage claim, the only economic damage claim that went to the jury was unpaid commissions and future commissions. The unpaid commissions were as a result of this cut and the future commissions were as a result of the termination. Those were the only issues that the expert opined upon, which is identified in ER 65, the summary of damages. And those are the only issues that were presented to the jury on damages. The court found that TRW did not cause the cut in commissions and it did not cause the termination of the agreement. Now, what it said is, well, to the extent you're claiming you were excluded from the property, there might have been evidence of that, but there was no evidence of damage resulting from that. The plaintiff didn't testify to that. In fact, the plaintiff's theory, which is internally inconsistent, according to the plaintiff, the, he didn't have to go back to TRW. At all. He didn't have to go and be involved on a daily basis. There was no evidence from the expert that the exclusion from the property resulted in lost commissions. Even Mike Brown, the principal of STREMA, told Johnson, and this is at, find the site, but he told Johnson that he was still going to continue to pay the commissions even if he did not call upon TRW. And that's their theory. That's their, that he could sit back once the sale was made and didn't have to do another thing. So is that what the contract says? No, it's not quite that. What it says is that, first of all, and to respond to your question earlier, Your Honor, about whether the damages were on commissions, on sales already made, that is not accurate. The sales, the purchase order was issued, but the contract clearly spells out that you get paid when sales are actually made. The plaintiff, the appellant, was seeking damages over a 10-year period of time. And so the sales were going to come in over that 10-year period of time. And Judge Cuddy, as you indicated, there might have been a defect down the road. There might have been problems down the road. There's no guarantee that sales would have been made. The theory is that he was prevented from doing that. That's the whole point of it, is that he was prevented from maintaining the relationship during the time that those monthly payments were made. But that's where the inconsistency in their theory is. Because if they had an obligation, if he had to continue to maintain the relationship, which he clearly testified to. I said that he was prevented from being paid monthly when the customer paid by terminating the relationship. That isn't servicing requirements. But that goes to the issue of whether TRW had any involvement in the termination. And there is no evidence other than speculation. Mike Brown testified the sole reason that he terminated the agreement is because Johnson Industrial Sales sent a letter a month before saying, if you don't agree to all these demands, I'm going to terminate the agreement and sue you. It's not a coincidence that the first time Johnson Industrial Sales ever made any, gave TRW any notice that there was some alleged wrongdoing was when they were served with the complaint. Despite the history between Johnson Industrial Sales and STREMA going back and forth over this two-year period about commissions and about payments and about programs, and STREMA telling them they were going to take it in-house and cut their commission rate, they never once approached or even mentioned to TRW that they thought they had done something wrong. And this is despite testimony from Paul Johnson, who had a longstanding relationship with TRW. He said he could talk to Linda Nervous's boss, Phil Hannaford, about anything. They didn't even try to salvage that relationship. Because they knew, and the evidence supports that TRW was not the cause of that. You have to look at the evidence that shows why the cut was made and why the termination was made. And the only inference that they have is speculation or a temporal sequence of events. Can you explain to me, I want to make sure I understand your argument. Assuming that we agreed with this causation, there wasn't any evidence of causation, how does that affect our evaluation of the district court's 50B motion? Since all that he granted was the portion of the motion, he concludes there was no substantial evidence of the equivalency of lost income and lost profits, and because of the uncontroverted evidence of the fact but not the amount of such expenses, this portion of the motion is granted. Now, how does this causation issue relate to our evaluation of this? First of all, as I pointed out, the district court did find no causal link between the conduct and the cut and commissions or the termination. But more importantly, the standard of review is de novo. And this court can look at the record, just like the district court did, and determine whether there's substantial evidence to support the jury's verdict. And when you look at the record and you get beyond the rhetoric and the exaggerated characterizations of the documents, as appellant put before the jury as well, the evidence shows that STREMA decided to cut the commission rate in half back in 2001, STREMA decided to terminate it, and everyone testified that there was no involvement by TRW in either of those decisions. Even Doug Johnson, the president, when asked, Do you have any indication that TRW was involved in the cut and commissions? No. Do you have any indication that TRW was involved in the termination of the agreement? No. And the Franklin Court, which is a California court of appeal case, dealt with this exact same situation. It dealt with a sales rep who had been terminated, who he believed was terminated after some disparaging emails were sent out to a customer. And the plaintiff said, Well, they sent the emails, and then I was terminated. And against that, the customer wrote a declaration and said, No, it had nothing to do with these emails whatsoever. And the California court of appeals said, You can't prove causation. You haven't proved causation under those circumstances. All you have is a temporal sequence of events. You have to show substantial evidence that the defendant's conduct caused the damage at issue. And that was not proven in this case. And if you look at the evidence that was submitted to the court, the evidence that's been submitted to this court, there simply is no evidence indicating that TRW's conduct played any role. Finally, with regard to the issue of the lost profits, I do want to address that because, first of all, the testimony of Doug Johnson, he testified that he had to continue to maintain the account, and there was expense associated with that. He testified to that. We quote the testimony in his brief. There is no question there are costs and there are expenses involved in maintaining it. But there was also testimony to the contrary, or not to the contrary, but that those costs were negligible. Well, I don't think that that was evidence that that is properly before the court because Doug Johnson testified that he didn't do anything to quantify that. I think it's not properly before the court. The evidence, the so-called evidence of the expert that said that the expenses would have been negligible was based upon statements he was told by counsel for the appellant. And that's one of the reasons why the district court found that it didn't constitute substantial evidence. There was no attempt to quantify the expenses. And we're not talking about expenses for a single day or a trip or a box of donuts. They're claiming a ten-year life of the program, that they were going to continue to maintain this relationship over ten years. That was information that was within the plaintiff's exclusive control. It is not as if they tried to present a quantification and the court held that it was insufficient. They admittedly did nothing to even attempt to. Their expert, who has written papers on lost profits, clearly testified, he understood the difference between lost commissions and lost profits, testified that all he was asked to do was look at the lost commissions. He did nothing to figure out what expenses would have been involved. He didn't look at any documentation. He only relied on counsel for Johnson Industrial Sales' statement that the expenses would have been negligible. There's no question under the law that it's the plaintiff's burden to prove net lost, net profits, not lost commissions. That was the holding in the Kids' Universe case and the American Fire Protection case that we raised. Counsel, your time has expired. We thank you for your argument. And I believe you do have some rebuttal time remaining. Starting with the last statement by Mr. Williams, the district court said when he made that same argument, the district court said no, no, no. He also testified that based on his own experience as an accountant and his own experience dealing with prior sales rep cases, that's what he based his opinion that there were no significant costs on. It wasn't just counsel's statements. And it's not just the opposite. It's obvious that everybody can use their common sense on the jury and the common sense tells you that there are no costs of a sales rep. If there are, they're insignificant. They're the price of a box of donuts. That's the reality. That's the truth. That's what the jury understands. That's what even Mr. Williams understands. He stood up here. He couldn't present you with any evidence of any costs which we should have had. Well, why didn't Mr. Biggins talk about the huge expense of a sales rep that has a cost of, you know, who knows whatever? There is no such thing. That's why a jury could reasonably infer, even if there's no direct evidence, they could reasonably infer there are no costs. The other things that Mr. Williams ---- Kennedy, did he take the purchasing agent on a trip to the Bahamas or anything like that? I'm sorry, Your Honor? I say he didn't take the purchasing agent on a trip to the Bahamas or anything like that. Never, Your Honor. And it was actually Mr. Johnson's testimony that he doesn't make it a practice to buy purchasing agents. His practice is to make sales based on his reputation. He doesn't sell by bribery. You had one other point you wanted to make? Did you have one other point you wanted to make? Yeah, I did. It's untrue that there was a conversation with Linda Nierbus. Mr. Williams said that there was never any conversations with TRW. That's not true. There was a recorded conversation that's in the briefing where he asks her point blank, did you really dictate this? And she said, no, I have no problem dealing with you. So that's not true what he said. And also he said there's no involvement by TRW, no evidence of involvement by TRW. Well, look at the dictate letter. The dictate letter says TRW dictated that you're not calling them anymore. And it was because of that that Johnson lost his commissions. There was a threat, but they never acted on the threat. As the testimony was, and it's in the briefing, TRW, I mean, Wayne Wire, of course they didn't want to pay the commissions anymore, but they never acted on the threat because they knew that would be a breach of the contract. It wasn't until TRW pushed them off the cliff, that's when they did it. Thank you, counsel. We appreciate the arguments of both parties. The case is submitted.
judges: Cudahy , Graber, Ikuta